**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-145** |
| **CHRISTOPHER MAURER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christopher Maurer to 54 months' incarceration – near the high end of the applicable Guidelines range – 3 years of supervised release, $2,000 restitution, and a $100 special assessment.

## I.    INTRODUCTION

The defendant, Christopher Maurer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Maurer, a former construction worker and member of the United States Navy from Maine, traveled to Washington D.C. on January 6, 2021. Maurer marched to the U.S. Capitol and joined the huge crowd at the Lower West Terrace "tunnel," the site of some of the longest and most violent attacks on police officers on January 6, for at least 90 minutes. During that time, he entered the tunnel once for approximately six minutes and repeatedly pushed against police officers and grabbed and tried to yank away two riot shields. Maurer left the tunnel only after being sprayed with OC spray but he stayed on the Inaugural Stage for over an hour. While on the stage, he witnessed the brutal attack of MPD Officer Michael Fanone. He reentered the tunnel and participated in at least two "heave-ho" pushes against the police, helped another rioter spray the police with OC spray, threw two different projectiles at police, whipped at the police with a cord, gave the middle finger to officers and repeatedly screamed "fuck you!" at them.

The government recommends that the Court sentence Maurer to 54 months of incarceration. A 54-month sentence reflects the gravity of Maurer's conduct, which involved multiple assaults of police officers, and Maurer's lack of remorse for his actions.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Offense filed in this case, ECF No. 48, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The majority of Maurer's actions took place at or near the Lower West Terrace "tunnel." Accordingly, the government refers the Court to Exhibit A,[2] which is a video compilation of the timelines of events at the tunnel on January 6, 2021.

### B.    Maurer's Role in the January 6, 2021 Attack on the Capitol

By approximately 2:56 p.m., Maurer was among the growing crowd of rioters on the Inaugural Stage outside the Lower West Terrace tunnel. Maurer wore a black jacket over a black fleece jacket, a white button-down shirt, a grey t-shirt, and jeans.



*Image 1: Still image from an open-source video depicting Maurer outside the tunnel*

---

[2] The government will provide copies of its sentencing exhibits to the Court via USAfx and will deliver a flash drive containing copies of the same to the defendant at the D.C. Jail, along with a copy of this submission.

At approximately 2:59 p.m., Maurer entered the tunnel for the first time. As he did so, he put on a black face mask.



*Image 2: Still image from Exhibit B, CCTV footage, showing Maurer entering the tunnel with a black face mask on*

Maurer pushed through the dense and unmoving crowd toward the police line in the tunnel. By approximately 3:02 p.m., Maurer had reached the police line in the tunnel, which was located directly behind the first set of gold double doors. Maurer immediately began to reach toward the police officers and pull the rioters in front of him in an effort to get at the police. *See* Exhibit C, clip of body-worn camera ("BWC") footage.



*Image 3: Still image from Exhibit C of Maurer with his hand wrapped around another rioter yanking repeatedly on a stolen police riot shield*

Immediately after this, the crowd of rioters near the police line grew more hostile and began to jointly push against the police. As rioters called out "keep pushing!", Maurer began to push against the rioters in front of him who pushed against the police. *See* Exhibit D, at timestamp 00:16. A rioter then called out "get the door open!" and another rioter pushed open the previously closed gold door. *Id.* at timestamp 00:34. The rioters, including Maurer, then surged toward the police as an alarm blared overhead. Maurer rushed toward the police line, grabbed an officer's riot shield, and tried to yank the shield away from an officer several times as a rioter behind Maurer sprayed the police line with bear spray.



*Image 4: Still image from Exhibit D at timestamp 00:54 showing Maurer yanking a police shield as a rioter behind him holds up a can of bear spray after deploying it on the police*

The rioters in the tunnel continued to fight the police. Maurer made his way closer to the north side of the tunnel directly in front of the police and continued to push up against the police officers there.

6



*Image 5: Still image from Exhibit D at timestamp 2:04 showing Maurer at the police line as
rioters fought the police in the tunnel*

Rioters in the tunnel then coordinated to yank a police shield out of officers' hands as a nearby rioter called out "take their goddamn shields!" *Id.* at timestamp 2:09. Maurer remained on the north side of the tunnel at the police line. The police then successfully pushed the crowd back by deploying OC spray and baton strikes. Maurer was the last of the rioters to back up from the police line, using his weight to push against the officers who were trying to get him to move back.



*Image 6: Still image from Exhibit D at timestamp 2:27 p.m. showing Maurer resisting officers' attempts to move him back in the tunnel*

In fact, Maurer remained pressed directly up against the police for at least 90 more seconds, until the police were finally able to shove him back.

8



*Image 7: Still image from Exhibit D at timestamp 4:02 showing police shoving Maurer away from the police line*

Even then, Maurer did not leave the tunnel. After being pushed back by the police, Maurer again pressed forward to position himself in direct contact with the officers. *Id.* at timestamp 4:25. Only after Maurer was sprayed by OC spray did he finally grope his way out of the tunnel. *Id.* at timestamp 4:55. Maurer left the tunnel at approximately 3:07 p.m.



*Image 8: Still image from an open-source video showing Maurer rubbing his eyes as he left the tunnel*

Approximately ten minutes later, Maurer remained on the Inaugural Stage as the police in the tunnel successfully swept all the rioters out of the tunnel and onto the Inaugural Stage. *See* Exhibit A beginning at timestamp 6:48. As the police pushed the rioters out, rioters grabbed two police officers – MPD Officer Fanone and USCP Officer Moore – and dragged the officers into the crowd on the Inaugural Stage. *Id.* beginning at timestamp 7:59. Maurer was among the crowd of rioters when the police officers were pulled into the crowd. He stood on the Inaugural Stage and watched as the crowd attacked the officers.



*Image 9: Still image from Exhibit A at timestamp 8:53 showing Maurer watching as MPD Officer Fanone and USCP Officer Moore were attacked by rioters on the Inaugural Stage*

In fact, Maurer was mere feet away from Officer Fanone as he was being ruthlessly attacked by rioters. *See* Exhibit E, open-source video, at timestamps 00:25 and 00:55.

11



*Image 10: Still image from Exhibit E, an open source video, at timestamp 00:55 showing Maurer just feet away from MPD Officer Fanone on the Inaugural Stage*

With the assistance of other rioters, Officer Fanone was able to make his way back to his colleagues in the tunnel before losing consciousness and getting medical attention. Soon after, Maurer pushed his way back toward the archway where the police line was then located. At that time, another rioter was speaking to the mob using a bullhorn. *See* Exhibit F, open-source video. The rioter told the crowd, including Maurer, "We're holding the line! We're not moving until we get our way!" *Id.* at timestamp 00:25.



*Image 11: Still image from Exhibit F at timestamp 00:08 showing Maurer near the police line at the tunnel and listening to a nearby rioter on a bullhorn*

By approximately 3:45 p.m., Maurer had reentered the tunnel and pushed his way   closer

to the police line. At about 3:50 p.m., the rioters on the Inaugural Stage, including Maurer, began

to push in a rocking motion together against the police line. *See* Exhibit G, open-source video clip,

beginning at timestamp 00:00. Approximately one minute later, a rioter near Maurer found a large

container of law enforcement OC spray. *Id.* at timestamp 00:30. The rioter held the container up

above the crowd and pointed it toward the police. *Id.* at timestamp 00:31. A rioter behind the one

with the OC spray appears to have tried to stop the rioter from using it. *Id.* As the first rioter turned

in the direction of the second, Maurer reached up and pointed the OC spray toward the police.



*Image 12: Still image from Exhibit G at timestamp 00:34 showing Maurer as he reached up, grabbed the cannister of OC spray and pointed it toward the police line*

The rioter holding the canister then sprayed the canister toward the police. *Id.* at timestamp

00:36. A few seconds later, the crowd begin to rock again against the police line, this time calling

out "HEAVE! HO!" *See* Exhibit H, open-source video clip.

Maurer stayed on the Inaugural Stage near the tunnel for at least 45 minutes after the

"HEAVE! HO!" thrust of rioters against the police. At approximately 4:27 p.m., the mob had

backed away from the police line, but individual rioters charged the line to attack the officers.

Specifically, a group of rioters approached the police line at about this time and dragged two police

officers – MPD Officers Wayte and Moore – into the crowd. At approximately 4:28 p.m., while

one of the officers was being assaulted in the crowd, Maurer was standing on the stairs leading into the entrance to the tunnel.

At about 4:31 p.m., Maurer approached the police line at the tunnel. *See* Exhibit I, at timestamp 00:52. Officers in the tunnel fired OC spray towards the crowd, including Maurer directly in an attempt to stop the attacks. *Id.* But far from backing off, Maurer bent down, picked up a long white pole and threw it at the officers in the tunnel.



*Image 13: Still image from Exhibit I at timestamp 1:02 showing Maurer throwing a white pole into the tunnel at police officers*

Maurer then stayed on the stairs to the tunnel for at least two more minutes before he again moved towards the police line. He bent down and picked up a long black stick-like object from the ground. *See* Exhibit K, BWC footage, at timestamp 00:01. Maurer then held the stick low in his right hand while he yelled at the police, "turn in your fucking badges, you sorry motherfuckers!" *Id.* at timestamp 00:09.   He then told them, "these aren't our people. You're not our people." *Id.* at timestamp 00:19. He was then sprayed directly in the face with OC spray. *Id.* at 00:23.



*Image 14: Still image from Exhibit J at timestamp 00:13 showing Maurer ducking his head as he's sprayed with OC spray*

Maurer, undeterred, then turned and displayed his middle finger at the officer who sprayed him with his left hand, calling out, "fuck you, asshole!" *Id.* at timestamp 00:15; Exhibit K at timestamp 00:25. A different officer then struck Maurer a second time with OC spray. Exhibit J at timestamp 00:17; Exhibit K at timestamp 00:28. This time, Maurer retreated, swung the black stick, and hurled it at the police in the tunnel. *See* Exhibit K at timestamp 00:30.



*Image 15: Still image from Exhibit J at timestamp 00:18 showing Maurer swinging the black stick*

Maurer released the stick which struck the side of the tunnel, ricocheted, and hit an officer in the helmet. *Id.* at 00:19. An officer then struck Maurer with OC spray a third time. *Id.* at timestamp 00:21. Maurer absorbed that strike turned back toward the police, again thrust his middle finger at the officers and again screamed "fuck you!" *Id.*; Exhibit K at timestamp 00:34. Maurer then swung both of his hands up in the air flashing his middle fingers on both hands and

17

shouted, "fuck all of you!" Exhibit J at timestamp 00:24; Exhibit K at timestamp 00:35. He then

whipped a cord[3] at the police on the front line. Exhibit J at timestamp 00:26.



*Image 16: Still image from Exhibit K at timestamp 00:37 showing Maurer whipping the police with a cord*

Maurer was sprayed yet again with OC spray shortly after this and finally moved to the

side of the tunnel and away from the archway.

### III.    THE CHARGES AND PLEA AGREEMENT

On May 3, 2023, a federal grand jury returned an indictment charging Maurer with nine

counts, including, Count Four, which charged him with assaulting, resisting and impeding certain

officers with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b). On July

23, 2024, Maurer was convicted of that offense based on a guilty plea entered pursuant to a plea

---

[3] Maurer's previous attorney claimed this cord was a phone charging cord.

agreement.

## IV.    STATUTORY PENALTIES

Maurer now faces sentencing on Count Four for assaulting, resisting, and impeding certain officers with a deadly or dangerous weapon.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Mauer faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Guidelines calculation set out in the PSR. Specifically:

Count Four: 18 U.S.C. § 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 111(b) | +2 |
| U.S.S.G. § 3A1.2(c)(1) | Official Victim | +6 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | Total Offense Level | 23 |

*See* PSR at ¶¶ 32-44.

Mauer has made a number of statements, both in court and in his interview with U.S. Probation, that appear to deny his guilt. *See e.g.*, PSR at ¶ 30 ("When asked if he accepted responsibility for his criminal conduct in the instant offense by accepting the elements of the count of conviction, Mauer declined to answer. Mr. Maurer further stated, "All I did was throw a fucking

stick."). If Mauer continues to refuse to fully accept responsibility during his sentencing hearing, the government will contest a reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility, as it is permitted to do under the plea agreement.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As set out in the plea agreement, section 4C1.1 does not apply in this case, because Mauer used violence or credible threats of violence during the offense. *See* Plea Agreement, ¶ 5(C).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 47. Accordingly, based on the government's calculation of Mauer's total adjusted offense level, after acceptance of responsibility, at 23, Mauer's Guidelines imprisonment range is 46 to 57 months' imprisonment. Mauer's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Mauer's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Mauer was not only a part of the riot that interrupted the

20

certification, he committed multiple violent attacks on police officers who were defending a sensitive entrance to the U.S. Capitol. He personally pushed against officers, attempted to rob them of their protective equipment (their riot shields), sprayed them with chemical irritants, threw two sticks at them, whipped at them with a cord, and verbally threatened them. He also witnessed countless violent attacks against them by other rioters at the tunnel. Maurer did each of these things as part of a huge mob of rioters that relentlessly attacked the police at the tunnel for hours. The nature and circumstances of Maurer's offense were of the utmost seriousness and fully support the government's recommended sentence of 54 months' incarceration.

### B.  The History and Characteristics of the Defendant

Maurer was 43 years old on January 6, 2021. PSR at ¶ 56. Although he was frequently uncooperative with and even antagonistic towards the Probation Office who wrote the PSR,[4] he reported a "great" childhood and has three adult children. *Id.* at ¶¶ 56-57. He denied any mental or physical health problems, other than an injury to one of his shoulders. *Id.* at ¶¶ at 64-66. He also denied any substance abuse issues or addictions. *Id.* at ¶ 67. Maurer did not complete high school but reportedly earned his GED. *Id.* at ¶ 69.

Maurer was enlisted in the United States Navy for less than five years and his discharge was less than honorable. *Id.* at ¶ 71. He was employed as of January 6, 2021, doing hourly work

---

[4] See PSR ¶¶ 55 (Maurer refused to provide contact information for his family members); 59 (sarcastically stating that "seeing the police murder an unarmed woman" was a relevant factor at sentencing); 61 (refusing to provide information about his social media accounts), 68 (refusing to "discuss any substance abuse history in further detail"), 69 (refusing to provide information about an arrest or his educational background); 71 (refusing to identify where he had been stationed when he was in the military); 75 (telling the Probation Officer to "look it up" when asked about his previous employment), 78 (declining to provide any financial information).

for a construction company. *Id.* at 74. Maurer has no adult criminal convictions. *Id.* at ¶ 46.

Maurer's stable background and lack of criminal history is neither aggravating nor mitigating. Maurer had many choices on January 6, 2021 other than to attack police officers who were defending the United States Capitol. His crimes were not motivated by necessity, abuse, neglect, or addiction, but instead by anger that his preferred candidate lost an election.

Similarly, Maurer's prior military service should not be viewed by the Court as mitigating in this case. Maurer served for less than five years in the United States Navy, an accomplishment that normally would be considered mitigating by sentencing courts. However, the nature of Maurer's crime – a violent attack on the very country he swore an oath to serve – sheds a different light on Maurer's prior military service. His history of service with the Navy means he, perhaps more than other civilians at the tunnel, should have recognized what he was doing to the police officers guarding the U.S. Capitol. Maurer arguably knew what it meant to serve and protect his country, yet he repeatedly used violence against the police officers who were doing just that on January 6th.

For all of these reasons, Maurer's history and characteristics support a sentence in the middle of the Guidelines range in this case.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Maurer's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20. A sentence in the Guidelines range will therefore reflect the seriousness of the offense and promote respect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Maurer's statements to U.S. Probation that "All I did was throw a fucking stick" (PSR at ¶ 30) could not more clearly demonstrate his utter lack of

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

remorse and understanding of the seriousness of what he did on January 6th. Maurer's refusal to cooperate with U.S. Probation Office during his interview is another aggravating feature of this case, providing more evidence of his lack of remorse. In fact, his refusal to cooperate with U.S. Probation and his statements downplaying his actions evidence not only lack of remorse but contempt for the court process, as well. Under these circumstances, it's clear there is a greater need here for specific deterrence and this factor weighs heavily in favor of a Guidelines sentence of 54 months' incarceration.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

      Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

      In *United States v. Thomas John Ballard*, 21-CR-553 (RJL), the defendant also committed his crimes at the Lower West Terrace tunnel. He arrived at the tunnel at 4:30 p.m., around the same time that Maurer joined the melee of rioters attacking police. He struck officers with a stolen police baton and a tabletop taken from inside the building. He also shined a light on officers and, like Maurer, threw multiple objects at them. Ballard pleaded guilty to a violation of 18 U.S.C § 111(a)(1) and (b), just like Maurer. His Guidelines range was also 46 to 57 months, like Maurer.

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Judge Leon sentenced Ballard to 54 months' incarceration, at the high end of the Guidelines range. A similar sentence for Maurer, who committed more assaults than Ballard, would not create an unwarranted disparity.

In *United States v. Nicholas John Languerand*, 21-CR-353 (JDB), the defendant also committed his crimes at the Lower West Terrace tunnel and, like Mauer, pled guilty to a violation of 18 U.S.C. § 111(a)(1) and (b). However, Languerand was only at or near the tunnel for approximately ten minutes before law enforcement reinforcements arrived and were able to clear the area of rioters. During that time, like Maurer, Languerand threw multiple items at the police including a speaker, a piece of wood, multiple sticks and an orange traffic cone. He also obtained a stolen riot shield which he banged threateningly on the floor in front of the police several times. Languerand had the same Guidelines range as Maurer. Judge Bates sentenced him to 44 months' incarceration. The government's requested sentence in this case would not create an unwarranted disparity, because Maurer spent a longer period of time at and in the tunnel while the violent attacks against police officers were in full swing. Mauer also engaged in more criminal conduct that Languerand, such as helping another rioter fire OC spray at police, attempting to steal police shields from officers, and joining group "heave-ho" pushes against the police inside the tunnel.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case did not suffer bodily injury as a result of Maurer's assaults. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Maurer must pay $2,000 in restitution, which reflects in part the role Maurer played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Maurer's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 103.

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   FINE

Mauer's conviction for violating 18 U.S.C. § 111(a)(1) and (b) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Mauer refused to provide the Probation Office with any information about his financial resources, and so has utterly failed to establish he is unable to pay a fine. Unless he provides such information before sentencing, the Court should impose a fine.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 54 months' incarceration, 3 years of supervised release, $2,000 in restitution and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney